ONAWAY TRANSPORTATION COMPANY, Plaintiff-Appellant,

v.

OFFSHORE TUGS, INC., Defendant-Appellee.

No. 82-3234 Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Jan. 14, 1983.

As Amended on Denial of Rehearings March 11, 1983.

Terriberry, Carroll, Yancey & Farrell, David B. Lawton, New Orleans, La., for plaintiff-appellant.

Francis Emmett, New Orleans, La., for defendant-appellee.

Before RUBIN, JOHNSON and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

The cast of characters in this marine drama begins with an ocean going ship, the M/V OLYMPIC SUN II, owned and operated by Onaway Transportation Co. (Onaway). Onaway's local Louisiana agent for the M/V OLYMPIC SUN II is Baton Rouge Marine Contractor (BRMC). Its New York agent is Central American Steamship (CAS).

The other named party in this cast of characters, Offshore Tugs, Inc. (Offshore), serves as a broker for a fleet of offshore tugs owned by various third parties. Offshore acts as a sales and marketing group for the tugs, and the parties have stipulated that its capacity as owner *pro hac vice* makes Offshore the proper defendant in this case.

On March 27, 1979, BRMC received a call from the pilots of the M/V OLYMPIC SUN II notifying the employee of BRMC taking the call that the ship was experiencing mechanical difficulty, was probably aground, and would require tug assistance. Offshore was then contacted by BRMC. It had three tugs available and immediately dispatched them to the location of the M/V OLYMPIC SUN II near the mouth of the Mississippi River.

After the tugs were dispatched on March 27, Offshore telexed the hourly rates of hire applicable to each tug to BRMC and requested that BRMC "acknowledge acceptance of above work agreement". BRMC immediately telexed its acceptance on behalf of the masters and owners of M/V OLYMPIC SUN II. The hourly rates quoted in Offshore's telex were the rates which

Offshore claims are applicable to the service of tugs when a ship is "dead in the water but afloat" and not for a ship which is aground.

On the next day, March 28, 1979, Offshore telexed higher rates on the services of the three tugs to BRMC. Offshore asserts these higher rates are its standard rates for tug assistance of a ship that is aground. Offshore followed this telex with another containing the terms of a proposed indemnity agreement. During the course of this day, several telephone conversations occurred between Mr. Savoie of BRMC and Mr. Dowie of Offshore concerning the overall problems with the M/V OLYMPIC SUN II. Offshore maintains that during these conversations, Mr. Savoie, of BRMC, accepted the proposed higher rates. Onaway maintains that there was no such acceptance. Mr. Dowie on behalf of Offshore testified in affidavit form that he could not remember whether Mr. Savoie on behalf of BRMC had responded to the telex requesting acknowledgement of the increased rates. Mr. Savoie testified that he never received authority from the New York agent CAS to accept the increased rates and that he never indicated to Mr. Dowie that the increased rates had been accepted.

Upon acceptance of the telex proposing the indemnity agreement, BRMC telephoned the terms to CAS in New York and obtained its verbal approval of the indemnity agreement. BRMC then sent a telex to Offshore which Offshore maintains constitutes an acceptance of the second day's higher rates for tug hire. This telex reads as follows:

> Ref M/V OLYMPIC SUN II—Your cable concerning terms of operation. Have passed terms by telex to owners of vessel. At this time we have verbal XXX verbal agreement with owners of said vessel that they agree to the conditions stated in telex you sent to ourselves as representatives of owners. As soon as they send to us by cable/telex their reply we shall send to you.

Approximately two hours later, BRMC received and transmitted verbatim to Offshore its authority to accept the indemnity agreement. But also included in this telex was the following language:

> Master instructed to note following quote agreed for services rendered for big tugboat U.S. dollars 423.25 per hour and U.S. dollars 236.25 for each smaller tugboats.

The rates quoted in this telex were the original rates stated by Offshore on March 27, and not the higher rates stated by Offshore on March 28.

Finally, the last telex exchanged between the parties was sent by Offshore to BRMC accepting the indemnity agreement. In this telex Offshore again requested that BRMC "please acknowledge acceptance" of the proposed increase in the hourly tug rate since the commencement of the job. BRMC made no response to this telex.

On March 30, 1979, Offshore prepared its invoice using the higher rates and sent it to BRMC. BRMC paid the amount invoiced. Upon learning that the higher rates were used to compute the amount due, the owners of the M/V OLYMPIC SUN II made demand upon Offshore for a refund of the difference between the higher and lower rates. Offshore refused the demand. Onaway instituted this suit against Offshore for restitution to obtain a refund of the claimed overpayment.

The case was submitted to the district court on depositions and other documentary evidence without presentation of live evidence. The district court held that Onaway, through BRMC, had agreed to the increased tug rates. It entered judgment for Offshore denying Onaway's claim for restitution. Upon appeal to this Court, both parties have submitted the case on the record and the briefs, waiving oral argument.

## THE TERMS OF THE CONTRACT

The central issue in this case is whether a binding contract between Offshore and Onaway stating the lower rates for tugboat services was completed on March 27. Offshore claims such a contract was not completed because at that time it did not know

that the M/V OLYMPIC SUN II was aground. It understood that it was only experiencing mechanical difficulty and needed towing, but was afloat. The district court on the record accepted this contention of Offshore, finding as a fact that Offshore did not know that the M/V OLYMPIC SUN II was aground until the next day, March 28, when it quoted the 25% higher rates for the tugboat services. We must review this finding of fact by the district court.

■ It is well established that the standard for the review of findings of fact of a district court is the "clearly erroneous" standard. Fed.R.Civ.P. 52(a); *Williamson v. Brown,* 646 F.2d 196, 200 (5th Cir.1981). Prior decisions of this Court, however, indicate that the degree of deference to be accorded a district court's findings of fact is lower when the case is submitted wholly on documents than in the situation where the evidence is presented by witnesses appearing before the district court. When the case is submitted wholly on a prepared written record outside of the presence of the judge, the judge has not gained the unique advantage in evaluating the evidence which normally comes from observing the demeanor of witnesses appearing before the court. Thus we have said:

> [W]e note that under this Circuit's jurisprudence, when a case is tried on a "cold" record consisting entirely of depositions and documents, the burden of proving the district court's findings clearly erroneous "is to some extent ameliorated."

*Stevens v. East-West Towing Co., Inc.,* 649 F.2d 1104, 1106 (5th Cir.1981), *quoting McKensie v. Sea Land Service, Inc.,* 551 F.2d 91, 92 (5th Cir.1977). *See also Sicula Oceanica S.A. v. Wilmar Marine Engineering & Sales Corp.,* 413 F.2d 1332, 1333 (5th Cir.1969). Although there may be some lessening of deference to the findings of fact of the district court, we are still bound by the requirement that we can overturn such findings of fact only if upon reviewing "the entire evidence" we are "left with the definite and firm conviction that a mistake has been committed." *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954).

■ We are convinced upon a careful reading of the entire record that such a mistake has been committed in this case. The uncontroverted daily boat logs of two of the tugs dispatched on March 27, 1979, to aid the M/V OLYMPIC SUN II state unequivocally that they were embarking to aid the M/V OLYMPIC SUN II which was "aground". These logs were made out in the regular course of business on March 27, absent any evidence to the contrary. They reveal without doubt that Offshore communicated to the tugboats on that date that their mission was to aid a ship which was aground. The third tug was dispatched at 6:00 a.m. on March 28, again to aid the ship which was "aground". This time was also before the time Offshore claimed it knew the ship was aground. Further, the March 27 day sheets kept in the Offshore offices indicated that the tugboats were being dispatched to "free up" the M/V OLYMPIC SUN II. Again these records are filled out on a daily basis. Under these circumstances Offshore's claim that it did not know the ship was aground until the next day, March 28, the day upon which it quoted the higher rates, is incorrect.

Since we find the record indicates that Offshore knew the ship was aground when it dispatched its tugs to the scene, Offshore and Onaway entered into a bilateral contract on March 27, 1979, through the exchange of telex messages. Under the terms of this contract Offshore undertook to aid the grounded M/V OLYMPIC SUN II in return for Onaway's promise to pay the rates for tug hire which had been proposed in Offshore's telex that day, the lower rates.

■ On the following morning, March 28, 1979, Offshore telexed the higher tug hire rates to BRMC. Even assuming that Onaway accepted Offshore's offer with respect to the higher rates, a matter in serious doubt in the record when all the telex messages are considered together, any such acceptance by Onaway would not be legally binding because there was no consideration to support it. The contract had been com-

pleted the prior day at the lower rates. This is black letter law: 1A Corbin Contracts 282 § 212; 1 Williston Contracts § 130; American Law Institute, Restatement Contracts 2d § 406; 17 Am.Jur. Contracts, § 460.

Once it is established that a contract containing the lower tug rental rates was binding and that no contract changing the rates was made on March 28, 1979, the appellant was legally bound to pay no more than the rates for hiring the tugs contained in the original contract. Yet when the job was over Offshore billed Onaway at the higher rates and Onaway paid. As soon as Onaway discovered, however, that the invoice had been calculated on the basis of the higher, March 28, rates, it asked for the return of the excess amount. Having been refused by Offshore, it brought this suit for restitution.

This Court has analyzed the right to restitution in such circumstances:

> Gulf Oil does not and cannot dispute the principle that, even though it was under no legal obligation to make the overpayments, if the money was voluntarily paid, with full knowledge of all the facts, it cannot be recovered.
>
> For that principle to apply, however, the overpayments must have been truly voluntary, that is, "done by design or intentionally or purposely or by choice or of one's own accord or by the free exercise of the will." *Prigmore v. Hardware Mutual Ins. Co.,* Tex.Civ.App.1949, 225 S.W.2d 897, 899. There must appear "an intention on the part of the payor to waive his rights." *West Texas State Bank v. Tri-Service Drilling Co.,* Tex.Civ. App.1960, 339 S.W.2d 249, 253. See also, 40 Am.Jur. Payment, § 159, p. 823; 70 C.J.S. Payment, § 134, pp. 343, 344.
>
> Money paid under a mistake of fact can be recovered. 70 C.J.S. Payment, § 157, pp. 367, et seq. As said in 44 Tex.Jur.2d Payment, § 77, p. 750: "It is a general rule that money paid under a mistake of fact, that is, an unconscious ignorance or forgetfulness of a fact, may be recovered."

The fact that the payor was negligent, or was carelessly ignorant of the facts as to which he was mistaken does not necessarily bar recovery, but may be considered in determining the equities between the parties and may reduce the amount of recovery. See A.L.I. Restitution, § 18c, p. 84, §§ 150–159.

*Gulf Oil Corp. v. Lone Star Producing Co.,* 322 F.2d 28, 31 (5th Cir.1963) (footnote omitted); *see also Smith v. Noble Drilling Co.,* 272 F.Supp. 321 (E.D.La.1967) (maritime action, relying on *Gulf Oil Corp. v. Lone Star Producing Co.;* per Rubin, J.).

There was no proof by Offshore that Onaway intended to waive its rights. Nor was there proof that Onaway was negligent or careless in paying the total sum based upon the higher rate. We, therefore, find that Onaway is entitled to recover the overpayment.

## UNJUST ENRICHMENT?

Offshore contends that even assuming that the earlier contract containing the lower tug hire rates was binding, that Onaway is not entitled to restitution because Onaway has not carried an asserted burden of proving that Offshore was unjustly enriched. Offshore's contention is based upon *United States v. Systron-Donner Corp.,* 486 F.2d 249 (9th Cir.1973). That case is not apposite to the instant case, however. In that case an erroneously inflated bid to a prime contractor by a subcontractor was accepted by the United States government on a cost-plus basis with the prime contractor. In that case the binding contract was at the higher amount. The Court held that the government was bound by the higher amount absent any fraud and that the subcontractor who had submitted the erroneously high bid which was accepted had not been unjustly enriched. In this case the contract was made at the lower figure. The erroneous payment by Onaway on Offshore's invoice is depriving Onaway of the benefit of its bargain upon which it relied. Offshore has made no showing that Onaway should be deprived of its firm agreement. Finally, it is well established that an excessive pay-

202

ment made in ignorance of the fact it is excessive is recoverable. Restatement, Restitution § 20; 66 Am.Jur.; Restitution and Implied Contracts §§ 119, 122.

## CONCLUSION

We hold that the district court was in error in its finding of fact that Offshore did not know the M/V OLYMPIC SUN II was aground until the day after it dispatched the tugs. Offshore knew the vessel was aground on March 27, when it stated the lower rate for the hiring of the services of the tugs in its acceptance. It follows that a binding contract containing those rates was completed on that day. Whether or not Onaway accepted the higher rates the next day—a highly disputed fact issue—Offshore was not entitled to the higher rates because there was no consideration for a modification of the contract. Onaway is entitled to restitution of the amount paid as a result of the erroneous billing by Offshore of its tugboat services at a rate which was in excess of the established contract rate.

REVERSED, and JUDGMENT RENDERED in favor of Onaway Transportation Company in the sum of $19,500.59, plus interest from the date of written demand, September 14, 1979.