Frederick **KIRKPATRICK** D.O.C.
Number 100337, Petitioner,

v.

Frank **BLACKBURN**, Warden, Louisiana State Penitentiary and The Attorney General of the State of Louisiana, Respondents.

No. 84–5025.

United States District Court,
E.D. Louisiana.

Dec. 3, 1984.

**1566**

Patrick L. Durusau, Jena, La., for petitioner.

William R. Alford, Covington, La., for respondents.

### MEMORANDUM AND ORDER

SEAR,. District Judge.

Frederick Kirkpatrick, a state prisoner, seeks habeas corpus relief from and a stay of execution of the death sentence imposed upon him in the Twenty-Second Judicial District Court for the Parish of St. Tammany, Louisiana following his conviction by a jury on November 10, 1982 for the crime of murder in the first degree. Although proceeding in forma pauperis, he has chosen Patrick Durusau as counsel to represent him in these proceedings.

The facts surrounding the offense are set out in sufficient detail and clarity in his direct appeal to Louisiana's Supreme Court that their repetition here is not warranted. *See State v. Kirkpatrick,* 443 So.2d 546 (La.1983). As grounds for relief, Kirkpatrick alleges 24 constitutional violations, which may be characterized as: 1) denial of his Sixth Amendment right to effective assistance of counsel; 2) violation of his Fourth Amendment right against unlawful arrest, search and seizure; 3) violation of his Fifth Amendment right against self-incrimination; 4) violation of his right to grand and petit juries selected from a fair cross-section of his community under the Sixth and Fourteenth Amendments; 5) violation of his Eighth Amendment protection against cruel and unusual punishment; and 6) violations of his Fourteenth Amendment right to due process.

■ Kirkpatrick claims to have exhausted his available state remedies. The state has not responded to this or any of petitioner's other claims and has filed no pleadings whatsoever in this proceeding. Accordingly, the State has waived any objection to a lack of exhaustion of state remedies. *See Barksdale v. Blackburn,* 670 F.2d 22, 24 (5th Cir.), *cert. denied,* 457 U.S. 1109, 102 S.Ct. 2912, 73 L.Ed.2d 1319 (1982). In any event, all but one of Kirkpatrick's claims were in fact presented in a habeas corpus petition filed in state court.

■ The single ground for relief not presented in that petition is Kirkpatrick's contention that his present counsel was ineffective in the state habeas proceeding. However, the purpose of habeas corpus is to afford one in custody the opportunity to attack the legality of that custody and to secure release from illegal custody. *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). Since petitioner's trial for first degree murder and not the state habeas corpus proceeding determined the custody about which he complains, a claim of ineffective assistance of counsel in the later proceeding does not relate to the validity of Kirkpatrick's conviction, and does not provide a basis for federal habeas relief. *See Taylor v. Maggio,* 727 F.2d 341, 348 (5th Cir.1984).

■ Furthermore, the adequacy of counsel in state habeas proceedings cannot be the basis of federal habeas relief because the state has no constitutional duty to provide counsel in collateral proceedings. *Green v. McGougan,* 744 F.2d 1189 at 1190

(5th Cir.1984); *Jones v. Estelle*, 722 F.2d 159, 167 (5th Cir.1983). Thus, although Kirkpatrick did not present this claim to the Louisiana Supreme Court on appeal from the decision of the state habeas judge denying post-conviction relief, he has exhausted his state remedies with respect to those of his claims that are properly cognizable by a federal habeas court. Kirkpatrick's petition is therefore properly before this court.

Kirkpatrick filed his petition for federal habeas relief on October 17, 1984. I conducted a hearing on October 19, 1984 to permit counsel for petitioner to articulate and define fully his claims. On October 20, 1984, I ordered that Kirkpatrick's execution be stayed because insufficient time remained prior to the execution scheduled for October 23, 1984 to allow me to review completely the voluminous record—including the transcripts of both petitioner's trial and his state habeas hearing—in light of petitioner's numerous claims.

### Standard of Review

■ A federal habeas court need hold an evidentiary hearing only if "the habeas applicant did not receive a full and fair evidentiary hearing in a state court either at the time of the trial or in a collateral proceeding." *Townsend v. Sain*, 372 U.S. 293 at 312–13, 83 S.Ct. 745 at 756–57, 9 L.Ed.2d 770 (1963). *See Austin v. McKaskle*, 724 F.2d 1153, 1156 (5th Cir.1984).

■ After a state post-conviction hearing has been held on the merits of a petitioner's claim, there is a statutory presumption of correctness attached to the state court's findings of fact in a subsequent federal habeas corpus proceeding. *Walker v. Maggio*, 738 F.2d 714, 717 (5th Cir.1984); *Armstead v. Maggio, Infra*, 720 F.2d at 895–96; *see* 28 U.S.C. § 2254(d). Therefore, unless the state court hearing was inadequate under the circumstances or the findings of fact are not fairly supported by the record, federal courts must defer to the state court's findings. *Walker v. Maggio, supra*, 738 F.2d at 717 (citing *Smith v. Estelle*, 711 F.2d 677, 681–82 (5th Cir.1983)), *cert. denied*, —— U.S. ——, 104 S.Ct. 1685, 80 L.Ed.2d 159 (1984).

However, of the 23 claims previously presented to the state habeas court, an evidentiary hearing was conducted with respect to only six of them. Moreover, the state habeas judge, who was also the trial judge, gives no hint of his reason for and no citation to legal authority supporting his rejection of petitioner's remaining constitutional claims without hearing. He made few specific findings of fact and filed neither written findings of fact nor conclusions of law into the record. Indeed, had the state judge afforded Kirkpatrick a full hearing on all of his constitutional claims and made clear findings from the evidence, it would not have been necessary for me to scrutinize meticulously the entire state court record to determine whether factual findings could be inferred that supported his conclusions. Nevertheless, the Supreme Court has held that federal habeas courts must give appropriate deference to implicit factual findings of a state habeas court when the state court conducts a hearing and enters a judgment from which findings of fact may be inferred. *Marshall v. Lonberger*, 459 U.S. 422, 103 S.Ct. 843, 850–51, 74 L.Ed.2d 646 (1983); *Armstead v. Maggio*, 720 F.2d 894, 896 (5th Cir.1983).

### State Evidentiary Hearing

The six claims for which the state judge permitted Kirkpatrick to present evidence in the state habeas proceeding fall into three categories: ineffective assistance of counsel; unrepresentative grand and petit juries; and denial of due process.

#### A. Ineffective Counsel

Kirkpatrick claims that the counsel representing him in Louisiana from the time of his extradition from Mississippi through his appeal to the Louisiana Supreme Court were ineffective and cites nearly 130 examples of alleged ineffectiveness. A representative, albeit necessarily incomplete list includes the failure of his trial counsel, Thomas Ford, to: (1) object to allegedly improper prosecutorial statements; (2) challenge the validity of the warrants for his arrest and the search of home; (3)

investigate and interview witnesses prior to trial; (4) move to suppress oral inculpatory statements; (5) conduct adequate voir dire examination of the talesmen, including failure to rehabilitate those talesmen excluded for cause because of their attitude toward the death penalty; (6) prepare Kirkpatrick before he testified at trial; (7) object to improper jury instructions; and (8) file a meaningful brief on direct appeal to the Louisiana Supreme Court. Many of these examples form the basis of other independent claims for relief in this petition. Kirkpatrick also contends that Ford's workload as a public defender was so excessive as to render his assistance per se ineffective.

The state court received evidence on both these claims and concluded that:

> Mr. Ford is competent. Mr. Ford is experienced. I understand and appreciate the arguments made by counselor for the petitioner throughout this day... This is hindsight, counsel.
>
> I am convinced that the jury's determination that death was the appropriate punishment in this case is reliable. I am not convinced that in any way this reliability was undermined by the action of Mr. Ford or Mr. Johnson [Ford's assistant]. I feel they were diligent and I have no doubt about the conscientious efforts of both these attorneys. In their defense of Mr. Kirkpatrick and their plea to the jury for his life, this jury was presented with evidence of a heinous offense, and ... I feel that the efforts of Mr. Ford were just as good, were comparable with those of the attorneys who were able to walk away from the trial with their client receiving only a life sentence.

Habeas Transcript (hereinafter "H.R.") at 491–92.

■ Whether a defendant has received ineffective assistance of counsel is a mixed question of fact and law. *Armstead v. Maggio*, 720 F.2d 894, 896 (5th Cir.1983). While findings of basic historical fact made after an evidentiary hearing are presumed to be correct under 28 U.S.C. § 2254(d), the trial judge's ultimate conclusion as to whether Kirkpatrick enjoyed effective assistance of counsel is subject to review under a different standard. It is necessary that I make an independent evaluation based on the trial judge's findings of historical fact. *See Armstead v. Maggio, supra*, 720 F.2d at 896. Unfortunately, the state judge failed to make any express findings of historical fact.

■ To succeed on a claim of ineffective assistance of counsel a defendant must demonstrate both that his counsel's performance was deficient, and that the performance so prejudiced his defense as to deny him a fair trial. *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). If proof of one element of the test is lacking, it is not necessary to address the other. *Id.* 104 S.Ct. at 2069; *Willie v. Maggio*, 737 F.2d 1372, 1392 (5th Cir.1984).

■ Whether deficiences in a counsel's performance denied a defendant a fair trial turns on whether "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Willie v. Maggio, supra*, 737 F.2d at 1392 (quoting *Strickland v. Washington, supra*, 104 S.Ct. at 2068). If the defendant challenges a death sentence

> the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Willie v. Maggio, supra*, 737 F.2d at 1392 (quoting *Strickland v. Washington, supra*, 104 S.Ct. at 2069).

Because I have read and considered the entire record of Kirkpatrick's trial, it is not necessary for me to review Kirkpatrick's allegations of ineffective assistance individually. *See Fulford v. Maggio*, 692 F.2d 354, 359 (5th Cir.1982), *rev'd on other grounds* —— U.S. ——, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983).

■ The evidence supporting Kirkpatrick's conviction and sentence is substantial. *See infra*, at 1579–1581. The record clearly illustrates that Kirkpatrick received a fair and constitutional trial; there is absolutely no doubt of his guilt. *See O'Bryan v. Estelle*, 691 F.2d 706, 710 (5th Cir.1982) (Gee, J., dissenting). Kirkpatrick has not demonstrated the prejudice necessary to establish a claim of ineffective assistance of counsel.

## B. Unrepresentative Juries

The second category of claims relates to the guarantee of a jury selected from a fair cross section of the community secured by the Sixth and Fourteenth Amendments. Kirkpatrick claims that there was systematic exclusion of certain groups from the general venire of both the grand jury that indicted him and the petit jury that convicted him and determined his sentence in the Twenty-Second Judicial District Court. Kirkpatrick contends that persons who are exempted from jury service under Louisiana Supreme Court Rule 25[1] and whose status thereafter changes, are never replaced on the jury roles and are therefore excluded from jury service in violation of Louisiana Supreme Court Rule 26 and the United States Constitution. Kirkpatrick concedes that the state habeas court heard these claims but argues that the hearing was held on notice insufficient to permit him the opportunity to muster all the evidence supporting his claim. While Kirkpatrick may indeed have had insufficient time to present evidence as to the number of such persons excluded, he did present evidence as to the fact that such exclusions had occurred.

■ The transcript of the state habeas proceeding demonstrates that the state judge found as a matter of fact that Kirkpatrick's claim was supported by evidence:

It would appear that some of the ones who had been exempted on grounds set forth under Rule 25 of the Supreme Court may not ever find their way back into the hopper box [the box containing name cards from which the general venire was selected].

H.R. at 476. This finding of fact is supported by the record and is therefore entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(d). The state judge, without citing any legal authority, nevertheless decided that the procedure followed in the selection of the venire did not deny Kirkpatrick his rights to a grand jury and a petit jury selected from a fair cross section of the people of St. Tammany Parish. H.R. at 477–478. In any case, a federal habeas court is not bound by a state court's conclusions of law, and may determine the proper interpretation of the law de novo. *See e.g. Cuyler v. Sullivan*, 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980).

■ Although the Supreme Court has held that the Sixth and Fourteenth Amendments guarantee a defendant a jury drawn from a venire which is representative of the community, the jury actually chosen is not required to "mirror the community and reflect the various distinctive groups in the population." *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975). To establish a prima facie violation of a defendant's constitution-

---

1. Louisiana Supreme Court Rule 25 provides that:

**Section 2.** This court finds that the exemption of the following groups or occupational classes is in the public interest and, accordingly, members of such classes are exempt from jury service:
(a) Public officers in the executive, legislative, or judicial branches of the Government of the United States, or the State, or any subdivision thereof, who are actively engaged in the performance of official duties;

(b) Members in active service in the Armed Forces of the United States and members of the National Guard of this State while on active service;
(c) Members of paid fire or police departments of the State or any subdivision thereof and federal law enforcement officers;
(d) Members of the following groups when regularly and actively engaged in the practice of their professions: attorneys at law, ministers of religion, chiropractors, physicians, dentists, pharmacists and optometrists;
(e) All persons over seventy years of age.

al right to a jury drawn from a fair cross-section of the community, the defendant must show:

(1) that the group alleged to be excluded is a 'distinctive group' in the community;

(2) that the group's representation in the source from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3) that this underrepresentation results from systematic exclusion of the group in the jury selection process.

*Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Once a defendant demonstrates a prima facie violation, the burden shifts to the state to show a significant state interest justifying the infringement.

■ To meet the second prong of the *Duren v. Missouri* test, a defendant must show that the disparity between the representation in the community as a whole of a group whose members are alleged not to be adequately represented in the venire, and the group's representation in the venire is not fair and reasonable. *Id.* 99 S.Ct. at 669. To determine whether a disparity is fair and reasonable in a case such as this involving a claimed violation of the Sixth Amendment, the Fifth Circuit has applied the standard used to evaluate claimed equal protection violations based on racial discrimination. *See United States v. Maskeny,* 609 F.2d 183, 190 (5th Cir.), *cert. denied* 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980). That standard turns on whether the absolute disparity between the number of group members represented in the venire and those in the community as a whole is greater than ten percent. *Id.; see United States v. Butler,* 611 F.2d 1066, 1069–70 (5th Cir.1980). More than five months have passed since the state habeas hearing and Kirkpatrick has not offered any more evidence of exclusions than that which he presented to the state habeas judge. Indeed, in his petition for federal habeas relief, he proffers no evidence of improper exclusions, only the conclusory statement that "the persons who once were

entitled to an exemption but were no longer at the time of the drawing of this venire constitute a significant cross-section of the community." Because petitioner has not offered any evidence as to the magnitude of the disparity, he cannot meet the second prong of the *Duren v. Missouri* test, and therefore cannot demonstrate a prima facie case of a constitutional violation. Thus, it is not necessary to consider whether the persons excluded from the venire in the court that convicted Kirkpatrick comprise a "distinctive group" under the first prong of the *Duren v. Missouri* test.

### C. Denial of Due Process

■ Kirkpatrick's third category of claims heard by the state habeas court are based on alleged Fourteenth Amendment violations. First, Kirkpatrick asserts that he was denied *Brady* material. Under the rule enunciated by the Supreme Court in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution must turn over to the defendant upon demand all material and exculpatory evidence that is in its possession or available to it. Suppression of favorable, material evidence violates the accused's constitutional right to a fair trial. *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196; *Austin v. McKaskle,* 724 F.2d 1153, 1156 (5th Cir. 1984); *Ogle v. Estelle,* 641 F.2d 1122 (5th Cir.1981).

■ In this case, Kirkpatrick asserts that the state "deliberately and intentionally withheld and failed to produce in response to [his] timely motion under *Brady v. Maryland* ...: the second page of the affidavit in support of the search warrant which contained the facts relief (sic) upon for probable cause." Kirkpatrick argues that the affidavit did not state probable cause and that the State of Louisiana deliberately sought to prevent his counsel from becoming aware of any ground upon which to challenge the admissibility of the evidence seized pursuant to the allegedly illegal search warrant.

It is not clear that the second page of the affidavit demanded by Kirkpatrick quali-

fies as favorable material evidence under *Brady v. Maryland*. In any case, Ford's testimony during the state habeas evidentiary hearing supports the state judge's factual finding that Ford before trial "had either reviewed the affidavit itself or something very much akin to it...." H.R. at 472–73. Although Ford's testimony at the state habeas proceeding indicates that his recollection of the circumstances surrounding Kirkpatrick's trial is dim, Kirkpatrick did not offer any evidence controverting Ford's testimony and does not now contend that there was any deficiency in the state habeas evidentiary hearing on this issue. Therefore, presuming the state judge's finding to be correct, as I must, there was no suppression of favorable material evidence in violation of Kirkpatrick's constitutional right to a fair trial under *Brady v. Maryland*.

Second, Kirkpatrick asserts that he was denied due process guaranteed by the Fourteenth Amendment when the judge at trial refused to grant the motion of his trial counsel to recess the trial overnight so that he could obtain the attendance of certain witnesses. The state trial transcript shows that at 7:45 p.m. immediately prior to the start of the sentencing phase of the trial, Ford moved to recess the trial overnight because of the absence of five of the six witnesses who had been subpoenaed to testify on Kirkpatrick's behalf. Trial Transcript (hereinafter "T.R.") Vol. IV, at 3. Kirkpatrick contends that he had an absolute right to present these witnesses as mitigating evidence during the sentencing phase of the trial, and that had the trial court granted an overnight recess, the missing witnesses—his foster parents, two children of his common-law wife, and his brother—would have attended the trial and testified on his behalf.

■ A motion for continuance is addressed to the sound discretion of the trial court and is not to be disturbed on a petition for habeas corpus unless there is a showing that there has been an abuse of discretion and that the denial was so fundamentally unfair that it violates constitution-

al principles of due process. *Skillern v. Estelle*, 720 F.2d 839, 850 (5th Cir.1983); *Hicks v. Wainwright*, 633 F.2d 1146, 1147, 1148 (5th Cir.1981).

■ The factors to be considered in determining whether a denial of a motion for a continuance made for the purpose of procuring defense witnesses was an abuse of a trial court's discretion are:

[T]he diligence of the defense in interviewing witnesses and procuring their presence, the probability of procuring their testimony within a reasonable time, the specificity with which the defense is able to describe their expected knowledge or testimony, the degree to which such testimony is expected to be favorable to the accused, and the unique or cumulative nature of the testimony.

*Hicks v. Wainwright*, 633 F.2d at 1149 (quoting *United States v. Uptain*, 531 F.2d 1281, 1287 (5th Cir.1976)) (footnotes omitted).

However, "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Skillern v. Estelle*, 720 F.2d at 850 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 901 (1964)) (emphasis omitted).

At trial, Ford explained the absence of the witnesses on the ground that neither they nor Kirkpatrick could afford motel accommodations or food or travel expenses for them for the entire length of trial, and that he and Kirkpatrick had been in contact with them by telephone and had advised them to delay their arrival, apparently until the sentencing phase of the trial was to begin. T.R. Vol. IV, at 4, 8.

Although the prosecutor inquired of the judge whether Ford could provide some assurance that the witnesses would be present the next morning if an overnight recess were granted—an assurance Ford

could not provide[2]—the trial judge was apparently concerned only with Ford's diligence in obtaining the attendance of the witnesses. He did not permit Ford an opportunity to describe the expected testimony of the missing witnesses. The focus of his inquiry was solely on determining whether the witnesses had been properly subpoenaed and served. The trial record reveals that at least three of the missing witnesses—the two children and Kirkpatrick's brother—had been served. T.R. Vol. IV, at 6. Nevertheless, without citing any legal authority, he ruled that even if the witnesses had been properly subpoenaed and served, Kirkpatrick had waived any claim to compulsory process because Ford did not raise the fact of the non-appearance at the beginning of trial. T.R. Vol. IV, at 7.[3]

The state judge had the opportunity at the state habeas hearing to reconsider his summary denial at trial of Kirkpatrick's motion to continue. However, he held the hearing only four days after Kirkpatrick's petition for state habeas relief was filed, and denied Kirkpatrick's motion for a continuance of that hearing so that he could obtain the attendance of all of the witnesses who had not been present to testify at the sentencing phase of his trial. Although several witnesses testified regarding their availability at the time of trial, only three of them were among the group of witnesses who did not appear at Kirkpatrick's trial. Kirkpatrick, however, submitted the affidavits of the two remaining witnesses, his foster parents.

In a discussion that is anything but a model of clarity, the judge in the state habeas proceeding found that subpoenas

had been issued to secure the attendance at trial of all six of the witnesses and that service had been made upon at least the two children (although the children were not named properly on the subpoena and were therefore not obliged to comply with them). H.R. at 486. The judge also found that Kirkpatrick's brother was at the time of trial under bond in Mississippi and unable to secure permission immediately to leave Mississippi to attend Kirkpatrick's trial.[4] H.R. at 487–88. These findings are fairly supported by the record, and although not written, are entitled to a presumption of correctness. See supra at 1567.

The judge concluded that even if he had granted an overnight recess of the trial, none of the five missing witnesses would have been present for trial the following day, and that Kirkpatrick had failed to establish any prejudice resulting from their absence. H.R. at 488. The records of the state habeas hearing and of the trial, however, fairly support this conclusion only with respect to the attendance of Kirkpatrick's brother who was under bond at the time of trial. No evidence was presented at the state habeas hearing supporting a conclusion that the children would or would not have been present at trial. Ford and Kirkpatrick were both examined with respect to their knowledge regarding the attendance of his foster parents, Mr. & Mrs. Arthur Jones, but the record provides little support for the judge's conclusion. Furthermore, the state judge offers no clue as to the evidence he relied upon in reaching his determination that the absence of the

2. Ford replied to the prosecutor's statement: "Well, your honor, I certainly don't have the resources at my disposal that the district attorney's office has. I cannot assure the court of anything. I can merely try." T.R. Vol. IV, at 4.

3. The judge merely stated: "Yes, if these witnesses didn't show up for Monday morning at nine-thirty o'clock a.m., this was the time for us to deal with this particular problem, not at seven forty-five on Thursday evening."

4. Kirkpatrick's brother testified that he had been advised that approximately two weeks would be required to secure permission to leave Mississippi. The judge nevertheless concluded that "I feel that with perseverance and enthusiasm, this two week period could have been cut short to one day." H.R. at 488. The judge offers no support for this conclusion and, even if valid, provides no explanation as to why he did not continue the trial to permit Kirkpatrick that day to obtain his brother's testimony.

witnesses was not prejudicial to Kirkpatrick.

The relevant record consists of the affidavits of Anabelle and Arthur Jones, and the testimony of Ford and Kirkpatrick. In their affidavits, the Jones both state that they would have attended trial and testified on Kirkpatrick's behalf at the sentencing phase. In addition, both describe the testimony they would have given at trial.

On the other hand, Ford testified at the state hearing that he had spoken to Anabelle Jones in early October (approximately one month before trial) and that she had said "that for some reason they [apparently referring to herself and Arthur Jones] would not be able to make it at the trial." H.R. at 93–94. Ford continued, "I would like to have had them at the trial, but they simply couldn't make it." H.R. at 94.

This testimony, however, directly contradicts Ford's own representation to the court at trial that the Jones were available and that they had been specifically advised to delay their arrival until their testimony was needed. *See infra* at 1574.

Ford's testimony during the state habeas proceeding is more probative of his inability to recall the circumstances of the trial than of whether a particular witness would have been available to testify had an overnight recess been granted. Despite his previous testimony at the state hearing that one month prior to trial he had known that the Jones would not attend the trial, Ford later testified in the same proceeding that his reason for requesting a continuance was the absence of the Jones. H.R. at 94. Still later in the hearing, when he was asked the following question:

> Now, is it fair to say that one of the reasons why you moved for the continuance at the time of the trial, the recess overnight, was because you felt like you wanted to call [Anabelle Jones] as a witness on behalf of Mr. Kirkpatrick. Is that true?

Ford replied, "I wish I could answer you yes or no. I just can't. I don't remember." H.R. at 103. After being reminded that he had "stated for the record [at trial]

that [he] had wanted to have [Anabelle Jones] there the next morning," Ford acquiesced, declaring "Okay. Then I'm saying yes. Yes. If that's what it states in the record. Sure, I will agree to that." H.R. at 104.

In light of Ford's uncertainty during the state habeas hearing regarding his reasons for requesting the overnight recess of the trial, his testimony regarding the issue of whether Anabelle Jones would have attended had the recess been granted is just not reliable.

Kirkpatrick testified at the state habeas hearing that on the night that the judge denied the continuance, he was asked by Ford why the Jones had not appeared. H.R. at 400. Although that testimony casts further doubt on Ford's testimony that he was aware that the Jones "simply couldn't make it," Kirkpatrick's testimony is neither credible nor lucid. For example, at different times before trial he told six or seven stories regarding his role in the death of the victim. Moreover, Kirkpatrick's testimony contradicts both Ford's statements at trial and his testimony at the state habeas hearing. It suggests that the reason why the Jones were not present may have been related to their employment.

Kirkpatrick testified that he had called Anabelle Jones two days after completion of the trial to learn why the Jones had not attended, and she had said "neither one of them could get off work in the time that they got the subpoena, by the time the trial was supposed to be." H.R. at 401. According to Kirkpatrick's testimony, the Jones had been subpoenaed for a previous trial date and had taken leave from work, but that their employer

> wouldn't let them off again by the time they had been noticed. But what they didn't know [was that] they could have just came, as long as they were here that Wednesday [the day the motion for continuance was made] when they were supposed to get on the trial—get on the stand. But they didn't know this you see. They figured if they weren't there

that Monday [the first day of trial] there wasn't not use in them coming.
H.R. at 401–02.

Thus only Ford's testimony and Kirkpatrick's confused and uncredible testimony in the state habeas proceeding supports the state judge's conclusion that the Jones would not have been in attendance had he granted the overnight continuance. Ford's testimony, however, is directly controverted by Ford's statements to him in open court at trial, the affidavits of the Jones, and other testimony at the state habeas hearing of Ford himself. It therefore cannot be said that the evidence fairly supports the state judge's finding that the Jones would not have attended. Indeed, the most compelling conclusion that can be drawn from the record is that Ford no longer remembers the circumstances surrounding Kirkpatrick's trial.

### Federal Evidentiary Hearing

The factual determinations of a state habeas court are to be accorded a presumption of correctness only to the extent that they are "fairly supported by the record." 28 U.S.C. § 2254(d)(8); *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 769–70, 66 L.Ed.2d 722 (1981). Because the record hardly supports any conclusion, I ordered on October 22, 1984 that a hearing be held on October 26, 1984 to allow both the petitioner and the State of Louisiana to present evidence regarding petitioner's claim that the state judge's denial of an overnight recess of the trial was improper. On the unopposed motion of petitioner, I continued the hearing until November 5, 1984 to permit him to secure the attendance of certain witnesses.

At the evidentiary hearing, the only evidence presented by petitioner was the testimony of his foster parents, Anabelle and Arthur Jones. They each testified that Ford had contacted them prior to trial, and had promised to call them when their presence was desired at trial. Their testimony was that they were ready to come and were "waiting by the phone," but Ford never called. They testified that they had only a general idea of when the trial was to begin, and that they were not aware that Kirkpatrick's trial had taken place until after it was completed.

Counsel for the State of Louisiana did not seek to controvert this testimony; he was content to establish that had the Jones been called, they could have driven from their home in Mississippi to the court in Covington, Louisiana in approximately four hours, a fact of little significance in light of the judge's refusal to grant the continuance.

The Jones each testified that had they been present at the sentencing hearing they would have testified that Kirkpatrick's parents were very poor, and that he had not received adequate food, clothing and education. They also testified that Kirkpatrick's mother and father died when he was young and that he lived with the Jones from the time of his mother's death when he was fourteen years old until he was nineteen years old. According to the Jones' testimony, they treated Kirkpatrick as a son. While he lived with them, he attended school for a while receiving "special education," and worked for Mr. Jones.

Mrs. Jones' testimony, however, evidenced her difficulty in recalling basic facts about her relationship with Kirkpatrick. Although she remembered that he had been in trouble with the police on three or four occasions, at least once for stealing, she was unsure whether he had ever been arrested. She was certain that he had visited after he had left their household, and estimated that he had done so on about six occasions. She was unsure, however, how much time elapsed after he left their household before he was arrested for the offense in this case. On the whole, I did not find her to be a very favorable witness for Kirkpatrick.

Mr. Jones testified with far more confidence, but he contradicted his wife on at least two occasions. He testified that Kirkpatrick's troubles with the police involved only traffic violations and that Kirkpatrick had returned to visit the Jones only once after his departure from their home.

The uncertainty of Mrs. Jones while testifying and the inconsistency between her testimony and that of her husband's bears on their credibility. However, both testified with certainty about the arrangement that had been made with Ford, and that testimony is consistent with Ford's explanation for their absence to the state judge at trial. It is impossible to reconcile completely that version of events with Kirkpatrick's testimony at the state habeas hearing, but Kirkpatrick is not a credible witness. His testimony contradicts all of the other evidence presented. Consequently, I find that had the trial judge granted the overnight continuance, the Jones would have been present at trial the next day to offer their testimony.

Not only was the testimony of the Jones available within a reasonable time, but when viewed from the perspective of the state judge at trial, it was certainly potentially favorable to Kirkpatrick. The Fifth Circuit has emphasized the need of a capital defendant to present his human qualities to the jury and has suggested that such a need may be satisfied by the testimony of family members. *Milton v. Procunier*, 744 F.2d 1091 at 1100 (5th Cir. 1984).

Moreover, the Supreme Court has held that

> the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a *mitigating factor*, and aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

*Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (plurality opinion)). *See Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). *See also Roberts (Harry) v. Louisiana*, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977); *Roberts (Stanislaus) v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). In this case, the state

judge deprived Kirkpatrick of the testimony of his foster parents, the only persons competent to testify about his deprived childhood and his human qualities while he was a youth. Theirs was "the only testimony potentially effective to his [presentation of mitigating evidence]" to the jury. *See Hicks v. Wainwright*, 633 F.2d 1146, 1147, 1150 (5th Cir.1981) (abuse of discretion not to grant continuance where witness was available within six hours and was defendant's only expert); *United States v. Fessel*, 531 F.2d 1275, 1280 (5th Cir.1976) (district court reversed for failure to permit continuance to secure testimony of out-of-state psychiatrist whose written reports provided defendant's only hope of a favorable verdict); *Dickerson v. Alabama*, 667 F.2d 1364, 1370 (11th Cir.) (often cited as a Fifth Circuit case, *e.g.*, *United States v. Khan*, 728 F.2d 676, 678 (5th Cir.1984)) (testimony of out-of-town policeman witness would have "lent a new aura of credibility to [the defendant's] alibi defense") *cert. denied* 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982). His decision therefore constituted an abuse of discretion.

Kirkpatrick had been in jail awaiting trial for nine months before his trial began. Ford moved to continue at 7:45 p.m. on the third day of trial, and after the jury had found Kirkpatrick guilty. There is no explanation of why, in such circumstances, the state judge found it so urgently necessary to begin the sentencing phase of the trial immediately rather than granting the overnight recess. On the other hand, the trial of Kirkpatrick's co-defendant, set to begin on the same day as Kirkpatrick's was continued for two months. To paraphrase the Supreme Court, such "myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend [by presenting witnesses] an empty formality." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964). Moreover, an unreasonable refusal is certain to provide a defendant sentenced to death with a claim of constitutional magnitude that he can assert in any past conviction appeal or application.

Despite the trial judge's abuse of his discretion, Kirkpatrick is not entitled to federal habeas relief unless he was denied a fundamentally fair trial. *Skillern v. Estelle,* 720 F.2d 839, 850 (5th Cir.1983) (citing *Hicks v. Wainwright, supra,* 638 F.2d at 1148). The standard is whether there is a reasonable probability that the jury's decision would have been different had it heard the testimony of the Jones. *See generally Milton v. Procunier,* 744 F.2d 1091 at 1099 (5th Cir.1984) ("the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.") (quoting *Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984)).

As it turned out, the Jones were bad witnesses for Kirkpatrick. They had little contact with him after he left their home in 1976. Although Mrs. Jones testified that Kirkpatrick had visited their home on approximately six occasions, Mr. Jones testified that he was certain that Kirkpatrick had visited only once—just prior to his arrest for this offense approximately five years after he left their home. Similarly, they did not visit him while he was serving a sentence in the Mississippi State Penitentiary or during the eight months that he was confined and waiting trial in Louisiana although they were only four hours away. They both testified that Kirkpatrick had been in trouble with the police on several occasions, although their testimony was unclear as to the seriousness of those offenses. The general impression that they gave was one of diffidence with regard to Kirkpatrick's future.

Certainly, it cannot be said that the testimony of Kirkpatrick's foster parents, who lack concern about his future, would have created a reasonable probability that the jury would have concluded that Kirkpatrick ought not to be sentenced to death. Indeed, the inconsistencies in their testimony, their demeanor and the impact of their testimony would more probably have had an adverse impact upon the jury. The absence of the Jones did not deprive Kirkpatrick of a fundamentally fair trial.

## Petitioner's Remaining Claims

### A. Fourth Amendment Claims

Kirkpatrick claims that his arrest was unconstitutional because it was not supported by probable cause, and that an oral inculpatory statement made by him immediately following his arrest and the subsequent seizure of physical evidence were taken in violation of the Fourth Amendment.

■ It is well settled that a state prisoner may not be granted federal habeas corpus relief on the ground that the state introduced at trial evidence obtained in an unconstitutional search and seizure where the state courts provided an opportunity for full and fair litigation of the Fourth Amendment claim. *See Stone v. Powell,* 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976). In evaluating an application for habeas corpus relief based on asserted Fourth Amendment violations, the Fifth Circuit has stated that:

> The opportunity to present a Fourth Amendment claim to the state trial and appellate courts, whether or not that opportunity is exercised or proves successful, constitutes "an opportunity for full and fair consideration" of a defendant's Fourth Amendment claim under *Stone* absent sufficient allegations and proof that the state process is "routinely or systematically applied in such a way as to prevent the actual litigation of Fourth Amendment claims on the merits."

*Joshua v. Maggio,* 674 F.2d 376, 377 (5th Cir.1982).

■ A hearing was conducted by the state trial court on Kirkpatrick's Fifth Amendment motion to suppress an inculpatory statement made subsequent to his arrest and while in custody awaiting extradition to Louisiana. Kirkpatrick has not demonstrated that he was precluded by custom, practice or procedure from similar litigation of any Fourth Amendment claim.

*See e.g. Taylor v. Maggio,* 727 F.2d 341, 347 n. 7 (5th Cir.1984). Kirkpatrick was therefore afforded an opportunity to litigate his Fourth Amendment complaints in state court and may not assert those claims in a petition for a writ of habeas corpus in this court.

## B. Fifth Amendment Claims

■ Kirkpatrick also contends that his Fifth Amendment guarantee against self-incrimination has been violated. The transcripts of the hearing of his motion to suppress and of the trial reflect that Kirkpatrick was informed of his *Miranda* rights after his arrest for arson and again after his arrest for burglary and murder. Kirkpatrick argues that inculpatory statements made by him were nevertheless obtained as a result of illegal coercion. The coercion alleged by Kirkpatrick, however, does not arise from police misconduct in the form of threats or abuse. Rather, he suggests that he was illegally coerced when he was told by police that Charles Faulkner (his co-defendant) was "dumping" on him and that he had better say something to protect himself.

Kirkpatrick presented this claim to the Louisiana Supreme Court on direct appeal. Although Kirkpatrick neither argued nor briefed this contention and under Louisiana law that claim would generally be considered abandoned, *State v. Kirkpatrick,* 443 So.2d 546, 553 (La.1983), the Louisiana Supreme Court nevertheless reviewed this claim. That court concluded that Kirkpatrick was fully aware of his *Miranda* rights and at no time invoked any of them. *Id.* at 554.

Moreover, the allegedly coercive statements by the police were not part of an interrogation and therefore were not subject to the *Miranda* safeguards. The Supreme Court has stated that under *Miranda,* the term "interrogation" "refers not only to express questioning, but also to any word or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incrimina-

ting response for the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (footnotes omitted). The standard for what is likely to elicit an involuntary response is rigorous. In *Rhode Island v. Innis,* while a robbery suspect was being transported from the arrest scene to the police station, two officers in the vehicle engaged in a conversation between themselves concerning a shotgun allegedly used during the robbery. One of the officers stated that there were "a lot of handicapped children running around in this area" because a school for such children was located nearby and "God forbid one of them might find a weapon with shells and they might hurt themselves." The suspect interrupted the conversation and directed the officers to return to the arrest scene so that he could show them where the gun was located. At the scene the suspect was again advised of his *Miranda* rights but nevertheless led the police to the shotgun. In these circumstances the Supreme Court held that there was no express questioning of the suspect, and that their conversation was nothing more than a dialogue to which no responses by the suspect were invited. The court also found that the officers' conversation was not the functional equivalent of questioning because it was not reasonably likely to illicit an incriminating response from the suspect. *Id.* 100 S.Ct. at 1690.

By contrast, Kirkpatrick alleges that his statement was coerced because he was told that he had "messed up" with the initial statement that he had given the police and that "everything is being put off on you." Such a comment is no more likely to invoke a response on the part of a defendant than the conversation between the police officers in *Rhode Island v. Innis.* Moreover, Kirkpatrick had initiated this conversation with the police by asking questions concerning the status of the investigation into the victim's death and what Faulkner, his co-defendant, was saying about it. Kirkpatrick therefore suffers from no violation of his Fifth Amendment right against self-incrimination.

## C. Eighth Amendment Claims

Kirkpatrick contends that the death penalty in Louisiana is imposed on a freakish and wanton basis in violation of the Eighth and Fourteenth Amendments of the Constitution, but he offers no evidence supporting his claim. His petition contains only the conclusory statement that:

[n]umerous statistical studies can be produced to demonstrate that infliction of the death penalty depends more on the race of the victim or defendant, education of the defendant, geographic location of the offense and whether the defendant had appointed counsel than [on] the actual facts of the offense.

Upon information and belief, imposition of the death penalty in Louisiana is on a freakish and wanton basis, which varies more in response to the factors set forth [above] than the actual facts of the offense.

In the absence of any proffered evidence, such conclusory allegations do not entitle Kirkpatrick to relief or to an evidentiary hearing. *Moore v. Maggio*, 740 F.2d 308, 322 (5th Cir.1984); *see Prejean v. Blackburn*, 743 F.2d 1091 at 1099 (5th Cir.1984) (affirming district court's rejection of petitioner's tender of statistical proof of discriminatory application of the death penalty in Louisiana without an evidentiary hearing, where the tendered proof failed to account for aggravating circumstances).

Moreover, Kirkpatrick alleges no harm to himself arising from wanton and freakish imposition of the death penalty in Louisiana. He does not assert that his race or that of his victim, or the geographic location of his crime improperly influenced the jury that recommended he be sentenced to death. Kirkpatrick has no standing to raise claimed violations of the constitutional rights of others. *See Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

Thus, Kirkpatrick has made no claim which, if proved, would entitle him to relief. It is therefore not necessary to reach the propriety of the state court ruling denying this claim, or to grant Kirkpatrick an evidentiary hearing on this issue. *See Willie v. Maggio*, 737 F.2d 1372, 1395 (5th Cir. 1984) (district court did not abuse its discretion in denying motion for discovery of petitioner who made only conclusory allegation that Louisiana arbitrarily and capriciously imposed the death penalty on classes of which he was a member).

Kirkpatrick also claims that the Eighth and Fourteenth Amendments were violated by the Louisiana Supreme Court when it affirmed his sentence after conducting a "proportionality review." The Supreme Court has held that the Constitution does not require a state to conduct proportionality review of sentences of death imposed by its courts. *Pulley v. Harris*, —— U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). The Fifth Circuit Court of Appeals has held that proportionality review based on a smaller geographic area than the entire state is not prohibited by the Constitution. *Knighton v. Maggio*, 740 F.2d 1344, 1352 (5th Cir.1984); *Prejean v. Blackburn*, 743 F.2d 1091 at 1098 (5th Cir. 1984). In neither case, however, did the Fifth Circuit have before it a claim of arbitrariness resulting from review based on a varying geographic area.

Kirkpatrick claims that his sentence was reviewed for proportionality only with other death sentences imposed in the parish in which he was convicted, St. Tammany Parish, while the Louisiana Supreme Court has based review for proportionality in other cases upon comparison with death sentences imposed in a group of parishes or in the state as a whole.[5] Kirkpatrick alleges that the use by the Louisiana Supreme Court of a variable basis in conducting proportionality review, "injects an arbitrary factor into sentencing review, which would not be tolerated if the sentencing

---

5. It should be noted that the Louisiana Supreme Court in fact compared Kirkpatrick's sentence with other death sentences in all of the Twenty-Second Judicial District which includes both St. Tammany and Washington Parishes. *See State v. Kirkpatrick*, 443 So.2d 546, 561–62 (La.1983).

jury were allowed such unbridled discretion."

Even if this variable basis for sentencing review does inject, as Kirkpatrick contends, an arbitrary factor into the process, Kirkpatrick has once again failed to offer any evidence that he has been harmed. He does not argue that had his sentence been compared for proportionality with all death sentences imposed in a different geographical area, in the entire state, for example, his sentence would have been found to be too severe. Nor does he argue that persons sentenced to death have had their sentences reduced to life imprisonment after review for proportionality with sentences imposed in the entire state but who would not have enjoyed such a reduction had their sentences been reviewed only with others imposed in the district in which they were convicted. Admittedly such a showing would not demonstrate any direct harm to petitioner, but it could show that Louisiana's system was used to provide preferential treatment to certain defendants. In short, Kirkpatrick has failed to allege any injury or harm and he has no standing to assert this claim. *See Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

■ Kirkpatrick's final Eighth Amendment claim is that electrocution, the method chosen by Louisiana to execute those sentenced to death, constitutes cruel and unusual punishment. Kirkpatrick contends that death by electrocution involves a period of agonizing pain such that its use "would inflict wanton and unnecessary torture and torment upon him...."

Although it appears that the proper standard for determining whether a particular method chosen by a state to carry out its death penalty is unconstitutionally cruel turns on whether the method involves unnecessary or wanton infliction of pain, *see Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 2924–25, 49 L.Ed.2d 859 (1976); *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), it is not necessary to decide that issue. What-

ever standard is properly applied, Kirkpatrick could not meet it for he has proferred nothing more than conclusory allegations. *See Moore v. Maggio,* 740 F.2d 308, 322 (5th Cir.1984); *Prejean v. Blackburn,* 743 F.2d 1091 at 1099 (5th Cir.1984).

**D. Fourteenth Amendment Claims**

**1. Sufficiency of Evidence**

■ Kirkpatrick challenges both his conviction and sentence on the ground that the evidence adduced at his trial was insufficient to sustain his conviction and sentence. The standard for reviewing claims by federal habeas corpus petitioners of insufficient evidence is whether a rational trier of fact might have found that each essential element of the crime was proved beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Whitmore v. Maggio,* 742 F.2d 230, 231 (5th Cir.1984).

**a. Guilt**

■ Kirkpatrick contends that his conviction of first degree murder cannot stand because (1) "no evidence was presented to the jury to meet the elements of armed or simple robbery ..."; (2) "there was no proof that the killing occurred in the course of an armed or simple robbery"; and (3) "no evidence was presented to support the conclusion of which of the defendants had shot the victim."

First degree murder is defined in Louisiana as the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery, or simple robbery;

\*     \*     \*     \*     \*     \*

LSA–R.S. 14:30.

Under this statute, it matters not which of the defendants shot the victim. The issue is whether the evidence is sufficient that a rational trier of fact might have

found beyond a reasonable doubt that Kirkpatrick intended to kill or to inflict great bodily harm upon the victim.

The Louisiana Supreme Court on direct appeal has determined that "there is ample evidence that the defendant both attempted and intended to kill [the victim]." *State v. Kirkpatrick*, 443 So.2d 546, 553 (La.1983).

At trial, Kirkpatrick testified that he struck the victim over the head with a glass object and that he then stabbed him twice with a knife. *See* T.R. Vol. III at 744. In such circumstances, a rational trier of fact could determine beyond a reasonable doubt that Kirkpatrick indeed intended to kill or to cause great bodily harm.

■ Kirkpatrick also challenges the jury's decision that he had committed armed or simple robbery. Louisiana defines the elements of robbery as

> the theft of anything of value from the person of another or which is in the immediate control of another, by use of force or intimidation....

LSA–R.S. 14:64, 65. Whether the offense constitutes armed or simple robbery depends on whether the robber is armed with a dangerous weapon. *See* LSA–R.S. 14:64, 65. Kirkpatrick testified at trial that he committed each of the elements of the offense of robbery. He testified that he inflicted serious injury upon the victim, removed some of the victim's possessions from his house, and then carried them off in the victim's truck. T.R. Vol. III at 744; T.R. Vol. IV at 745–750. Kirkpatrick has therefore admitted committing robbery and that admission, together with the other evidence in the record, is sufficient to support the finding by a rational trier of fact beyond a reasonable doubt that he did so.

Kirkpatrick's last contention regarding the sufficiency of evidence supporting his conviction is essentially that he did not steal from the victim until after the victim was dead, and that therefore the killing did not occur while he was "engaged in the perpetration of" armed or simple robbery. Kirkpatrick's petition does not develop this contention, but his counsel indicated at oral argument that Kirkpatrick's argument is

that he lacked any intent to rob until after the victim's death. The conclusion that Kirkpatrick wishes to be drawn is that the victim did not die while Kirkpatrick was engaged in the perpetration of robbery.

The Louisiana Supreme Court has interpreted "engaged in the perpetration of" as meaning "in the course of commission of." *State v. Tuckson*, 414 So.2d 360, 363 (La. 1982). There is sufficient evidence in the record to support the finding of a rational trier of fact that beyond a reasonable doubt, the victim was killed while Kirkpatrick was in the course of committing a robbery.

**b. Sentence**

■ Kirkpatrick also attacks his sentence claiming that there was insufficient evidence to support the jury's finding of aggravating circumstances that: (1) Kirkpatrick was engaged in the perpetration or attempted perpetration of an armed robbery or simple robbery; and (2) the offense was committed in an especially heinous, atrocious or cruel manner.

As already discussed, the evidence supports the conclusion of a rational trier of fact, that beyond a reasonable doubt, the victim was killed while Kirkpatrick was perpetrating a robbery. *See also State v. Kirkpatrick*, 443 So.2d 546, 560 (La.1982) (holding that "[t]he evidence fully supports the finding that the offense was committed during the perpetration of a robbery.")

■ In cases where the jury has found more than one aggravating factor, it is necessary only that one of them be supported by the record to sustain a sentence of death. *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *see Knighton v. Maggio*, 740 F.2d 1344 (5th Cir.1984); *Moore v. Maggio*, 740 F.2d 308, 321 (5th Cir.1984). Thus, it is not necessary to reach Kirkpatrick's contention that the jury improperly found that the murder was committed in an especially heinous manner.

**2. Prosecutorial Misconduct**

Kirkpatrick claims that the conduct of the prosecutor at his trial rendered the trial

fundamentally unfair. In his petition, he cites seventeen "of the most flagrant examples." These examples can be condensed into eight categories: (1) comparing the rights of the defendant to those of the victim; (2) referring to the personal character of the victim, including the fact that he had been the victim of a burglary before; (3) forcing Carolyn Wright to assert the marital privilege in front of the jury; (4) attempting to impeach Kirkpatrick with an alleged parole violation of possession of knives without having any factual basis for such an allegation; (5) stating his opinion as to the persuasiveness of the evidence; (6) asserting that the District Attorney's office would not have been doing its job if it had not prosecuted Kirkpatrick; (7) telling the jury that it had a duty to protect society from Kirkpatrick; and (8) incorrectly describing Louisiana's law of principles.

In the absence of an alleged violation of a specific provision of the Bill of Rights, a state court conviction may be reversed only where the allegedly improper conduct made the trial fundamentally unfair. *Willie v. Maggio,* 737 F.2d 1372, 1390 (5th Cir.1984); *O'Bryan v. Estelle,* 714 F.2d 365, 387 (5th Cir.1983), *cert. denied sub nom. O'Bryan v. McKaskle,* — U.S. —, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). For a petitioner in a habeas corpus case to establish that the prosecutor's remarks rendered his or her trial fundamentally unfair, he or she "must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred. *Willie v. Maggio, supra,* 737 F.2d at 1390–91 (quoting *Fulford v. Maggio,* 692 F.2d 354, 359 (5th Cir.1982) *rev'd on other grounds,* 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983)).

"A state defendant has no constitutional right to an error-free trial." *Banks v. McGougan,* 717 F.2d 186, 190 (5th Cir.1983). The instances of prosecutorial misconduct alleged by Kirkpatrick do not demonstrate either persistent or pronounced misconduct. Moreover, the evidence supporting Kirkpatrick's conviction is not insubstantial. *See supra,* at 1579–1581. The record demonstrates that Kirkpatrick received a fair and constitutional trial; there is no doubt of his guilt. *See O'Bryan v. Estelle,* 691 F.2d 706, 710 (5th Cir.1982) (Gee, J. dissenting). In light of the evidence against him, the statements complained of do not rise to the level of a denial of a fundamentally fair trial. *See Higgins v. Wainwright,* 424 F.2d 177, 178 (5th Cir.), *cert. denied* 400 U.S. 905, 91 S.Ct. 145, 27 L.Ed.2d 142 (1970).

### E. Sixth Amendment Claims

#### 1. Improperly Selected and Instructed Jury

Kirkpatrick alleges several constitutional deficiencies with respect to the jury that convicted and sentenced him. The deficiencies can be best considered as claims that the jury was improperly selected and instructed.

#### a. Jury Selection

Specifically, Kirkpatrick contends that the jury was improperly selected because: (1) the trial judge conducted the voir dire examination collectively and not individually, and without first sequestering the talesmen; (2) the exclusion of those jurors properly excluded under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) resulted in a jury not drawn from a fair cross-section of the community and that was conviction prone; and (3) while the State was permitted to challenge for cause under *Witherspoon v. Illinois, supra* and La.Code Crim.Proc. art. 789 those jurors who would not under any set of facts or circumstances vote to impose the death penalty, he was not permitted to challenge for cause those jurors who would always vote in a capital case, irrespective of the facts and circumstances, to impose the death penalty.

#### (i.) Individual and Sequestered Voir Dire

The decision whether to conduct voir dire of talesmen individually or collectively, like the decision whether to

permit counsel to participate in the voir dire is within the discretion of the trial court. *United States v. Hawkins*, 658 F.2d 279, 283 (5th Cir.1981). The appropriate standard for evaluating a trial court's exercise of discretion in conducting the voir dire examination is whether "the means employed to test impartiality have created a reasonable assurance that prejudice would be discovered if present." *United States v. Saimiento-Rozo*, 676 F.2d 146, 148 (5th Cir.1982). Kirkpatrick has offered no evidence that the voir dire conducted by the state judge and in which his attorney participated did not create a reasonable assurance that any prejudice would be discovered. Instead, he has merely stated conclusorily that individual voir dire "is the most effective means of probing prospective jurors ... and that it is especially necessary in a capital prosecution." That is insufficient to establish a constitutional violation.

### (ii.) Exclusion of Witherspoon—Excludable

Kirkpatrick contends that Louisiana's Code of Criminal Procedure, which consistent with *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) permits the exclusion for cause of jurors who express their inability ever to vote to impose the death penalty, produces juries that are conviction prone and deprived him of a jury drawn from a representative cross-section of society. The Fifth Circuit has considered and rejected such challenges to similar statutes in Florida and Georgia. *Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir.1978); *Smith v. Balkcom*, 660 F.2d 573 (5th Cir.1981). Following the Fifth Circuit, the Fourth Circuit recently reached the same conclusion regarding North Carolina's statute. *Keeten v. Garrison*, 742 F.2d 129 (4th Cir.1984).

Most recently, these challenges to Louisiana's use of *Witherspoon* death-qualified juries were presented to the Fifth Circuit in *Knighton v. Maggio*, 740 F.2d 1344 (5th Cir.1984), which held that they were "not to be gracelessly ignored, but ... which must be directed to other fora, legislative and judicial." *Id.* at 1351. In the words of the Fifth Circuit, "[i]t is not for this court, at this time, in this setting, to plow that legal furrow." *Id.* at 1351.

### (iii.) Non-exclusion of Automatic Death Penalty Group

La.Code Crim.P. art. 789 permits the state to challenge for cause those jurors who would under no facts and circumstances vote to impose the death penalty. Kirkpatrick argues that because a defendant is not permitted to challenge for cause those jurors who would under all facts and circumstances vote to impose the death penalty—those he labels as the "automatic death penalty group"—he has been denied equal protection of the law. Kirkpatrick couches this claim as one implicating the Equal Protection Clause of the Fourteenth Amendment of the Constitution. But, his allegations that such jurors are conviction prone and unwilling to consider all of the evidence in determining sentence indicates that this is in fact another facet of his claim that he was denied a fair and impartial jury.

It is doubtful whether any jurors belong to the automatic death penalty group. The Supreme Court has said:

> [d]espite the hypothetical existence of the juror who believes literally in the Biblical admonition 'an eye for an eye,' it is undeniable ... that such jurors will be few indeed as compared with those excluded because of scruples against capital punishment.

*Adams v. Texas*, 448 U.S. 38, 49, 100 S.Ct. 2521, 2528, 65 L.Ed.2d 581 (1980). More importantly, the Fifth Circuit has declared that claims such as this are not properly addressed to this court. *See Knighton v. Maggio*, 740 F.2d 1344, 1351 (5th Cir.1984).

### b. Jury Instruction

Kirkpatrick claims that the jury was improperly instructed at both the guilt and sentencing phases of his trial on the ground that the jury was: (1) lead to believe that it could convict Kirkpatrick of first degree murder without first finding the intent to kill required under *Enmund*

*v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); and (2) not told whether Kirkpatrick could ever be paroled if he were given a sentence of life imprisonment.

The standard for review of an allegedly erroneous jury instruction is whether "the ailing instruction so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Bailey v. Procunier,* 744 F.2d 1166 at 1170 (5th Cir.1984); *Whitmore v. Maggio,* 742 F.2d 230, 233 (5th Cir.1984).

### (i.) Requirement of Intent

Kirkpatrick argues that the jury instructions permitted the jury to recommend a sentence of death without first finding that he had specific intent to kill as required by *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). The jury, however, was instructed that specific intent was required:

> Thus, in order to convict the defendant of first degree murder, you must find, one, that the defendant killed or was a principal in the killing of [the victim]; and two, that the defendant acted with a specific intent to kill or inflict great bodily harm; and three, that the defendant was engaged in or was a principal in the commission or attempted commission or armed robbery or simple robbery.

It cannot be said that a conviction by a jury that had received that instruction denied Kirkpatrick due process.

### (ii.) Possibility of Parole

Kirkpatrick contends that the jury was not properly instructed during the sentencing phase of his trial "as to the meaning of a life sentence," because the trial court refused to answer the jury's question, "[a]ccording to the law, does life mean until natural death, or does it mean a predetermined number of years?"[6]   T.R.Vol. IV, at 943.

The Louisiana Supreme Court on direct appeal held that Louisiana law forbids mention to the jury of "commutation or parole possibilities on a life sentence in a capital case [because it] introduces arbitrary factors which divert the jury from their primary responsibilities." *State v. Kirkpatrick,* 443 So.2d 546, 559 (La.1983). But more important, the Fifth Circuit has held that an instruction regarding the availability of parole *vel non* is not constitutionally mandated in a capital case. *O'Bryan v. Estelle,* 714 F.2d 365, 389 (5th Cir.1983), *cert. denied* — U.S. —, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). Kirkpatrick's claim is therefore not properly cognizable in this federal habeas proceeding. *See O'Bryan v. Estelle, supra,* 714 F.2d at 389.

### 2.  Effective Assistance of Counsel

The claims of ineffective assistance of counsel not heard by the state judge are based on several alleged failures of the counsel appointed to represent him in Mississippi and on an asserted conflict of interest of Ford, his trial counsel. In evaluating the claims presented to the state judge, I concluded that Kirkpatrick had a fair trial and that he therefore failed to demonstrate that he had been denied effective assistance of counsel. *See supra* at 1567–1569. That conclusion applies to these claims as well.

Accordingly, Kirkpatrick's petition for writ of habeas corpus is **DENIED.**

---

**6.** Although the note in which the jury asked its question is not in the record, the judge at trial read the note into the record. Apparently, the jury had also attached a similar note to its verdict of guilt. The judge also read that note into the record, "Question one, 'Life sentence, can there be parole?' Two, 'Can the present law be changed with regard to the above?'" T.R. Vol. IV, at 945.